



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed October 15, 2025**

_____
**United States Bankruptcy Judge**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# FT. WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| MATTHEW JENE TUBBS, | § | CASE NO. 22-42728-MXM-7 |
| | § | |
| DEBTOR. | § | CHAPTER 7 |
| | § | |

| | | |
|---|---|---|
| FELIPE ROBLES AND SHEREEN ROBLES, | § | |
| | § | |
| PLAINTIFFS, | § | |
| | § | |
| v. | § | ADVERSARY NO. 23-04019-MXM |
| | § | |
| MATTHEW JENE TUBBS, | § | |
| | § | |
| DEFENDANT. | § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW
*[Relates to Adv. ECF Nos. 14, 44]*

The Court conducted a two-day trial on the Complaint[1] filed by Mr. Felipe Robles ("***Mr. Robles***") and Ms. Shereen Robles ("***Ms. Robles***") (together, *"**Plaintiffs**"*) seeking (i) to liquidate their claims against Mr. Matthew Jene Tubbs ("***Mr. Tubbs***" or "***Defendant***"), and (ii) a determination that such liquidated claims are nondischargeable under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(6).

The Court has reviewed and carefully considered the pleadings, briefings, and submissions filed by the parties, the testimony of witnesses, the exhibits admitted into evidence,[2] and the arguments of counsel. The Court also took judicial notice of the pleadings referenced herein filed in Defendant's above-captioned bankruptcy case. This *Findings of Fact and Conclusions of Law* constitutes the Court's findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52, made applicable in this adversary proceeding by Federal Rule of Bankruptcy Procedure 7052.[3]

For the reasons detailed below, the Court finds and concludes that Plaintiffs satisfied—by a preponderance of the evidence—their burden of proof to establish (i) a claim in the total liquidated amount of ***$152,610.05***[4] against Defendant; and (ii) that such liquidated claim is nondischargeable under §§ 523(a)(2)(A) and 523(a)(6). Consequently, the Court will enter a separate final judgment for Plaintiffs against Defendant.

---

[1] *Complaint for the Determination of Nondischargeability of Debt*, Adv. ECF No. 1; *First Amended Complaint for the Determination of Nondischargeability of Debt*, Adv. ECF No. 14 (together, as amended the "***Complaint***").
[2] Adv. ECF No. 48.
[3] Any finding of fact that should more appropriately be characterized as a conclusion of law should be regarded as such, and *vice versa*.
[4] *See infra* at § III(G) for detailed breakdown of the total liquidated damages of $152,610.05.

## I.   JURISDICTION AND VENUE

The Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a) and the standing order of reference in this district. This adversary proceeding constitutes a core proceeding over which the Court has both statutory and constitutional authority to enter a final order and judgment pursuant to 28 U.S.C. § 157(b)(2)(A), (I), and (O). Even if this Court would not otherwise have the authority to enter a final judgment, the Court finds that the parties have consented to the Court's issuance of a final judgment in this proceeding. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.   PROCEDURAL BACKGROUND

On November 8, 2022, Plaintiffs filed a *Plaintiffs' Original Petition*[5] against Mr. Tubbs, his wife, Ms. Amy Tubbs ("**Ms. Tubbs**"), and their d/b/a Matt's Remodeling in the 296th Judicial District Court of Collin County, Texas, Cause No. 296-06119-2022 (the "***State Court Lawsuit***").

On November 11, 2022, Mr. Tubbs filed a *Voluntary Petition*[6] initiating the above-captioned bankruptcy case. Consequently, the State Court Lawsuit against Mr. Tubbs was stayed by operation of the § 362 automatic stay in his bankruptcy case. At no time did Plaintiffs file a motion or seek to lift the § 362 automatic stay in Mr. Tubbs's bankruptcy case to liquidate their claims against Mr. Tubbs in the State Court Lawsuit.[7]

---

[5] Adv. ECF No. 14, Exhibit 4.
[6] *See* Bkr. ECF No. 1.
[7] The record further indicates that Plaintiffs did not continue to prosecute their claims against Ms. Tubbs in the State Court Lawsuit.

3

On March 10, 2023, Plaintiffs filed the Complaint initiating the above-captioned Adversary Proceeding. The Complaint attached the Plaintiffs' Original Petition as an exhibit and incorporated the Plaintiffs' Original Petition into the Complaint "by reference for all purposes."[8]

On June 23, 2025, the Court entered the agreed *Joint Pretrial Order*[9] that was submitted by the parties.

Following trial and closing arguments,[10] the Court granted the parties' requests to file post-trial submissions, which were submitted on September 3, 2025.[11]

---

[8] Adv. ECF No. 14 at ¶ 7. Although the Plaintiffs' Original Petition filed in the State Court Lawsuit included a jury demand, at no time during the pendency of the Adversary Proceeding did Plaintiffs assert a right to a jury trial. Consequently, the Court finds and concludes that Plaintiffs waived their right, if any, to a jury trial to liquidate their claims against Defendant. Additionally, the Court notes that Ms. Tubbs was not named as a party in the Adversary Proceeding even though the Plaintiffs' Original Petition was incorporated by reference into the Complaint "for all purposes." *See* Adv. ECF No. 14 at ¶ 7. Further, Plaintiffs failed to offer any credible evidence to support, let alone establish by the preponderance of the evidence, any claims or causes of action against Ms. Tubbs that were alleged in the Plaintiff's Original Petition as incorporated into the Complaint.

[9] *See* Adv. ECF No. 44. "[I]t is a well-settled rule that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial. . . .The claims, issues, and evidence are narrowed by the pretrial order, thereby narrowing the trial to expedite the proceeding. . . . Once the pretrial order is entered, it controls the course and scope of the proceedings under Federal Rule of Civil Procedure 16(e), and if a claim or issue is omitted from the order, it is waived, even if it appeared in the complaint." *Elvis Presley Enters. v. Capece, et al.*, 141 F.3d 188, 206 (5th Cir. 1998).

[10] During closing arguments, Plaintiffs' counsel raised—for the first time—that Plaintiffs only sought a determination from this Court that their unliquidated claims against Mr. Tubbs be deemed nondischargeable and that they intended to return to the State Court Lawsuit to liquidate their claims. The Court disagrees. First, as previously noted, the Plaintiffs' Original Petition filed in the State Court Lawsuit was incorporated in the Complaint "by reference for all purposes." *See* Adv. ECF No. 14 at ¶ 7. Second, at no time did Plaintiffs file a motion or seek to lift the § 362 automatic stay to liquidate their claims against Mr. Tubbs in the State Court Lawsuit. Finally, in concluding that bankruptcy courts have statutory and constitutional authority to issue monetary judgments, the Fifth Circuit has ruled:

> . . . the litigation necessary to prove nondischargeability also proves the basis for and amount of the debt. There would be no judicial efficiency in requiring the beneficiary of a nondischargeability judgment to pursue a separate lawsuit in state or federal court in order to secure a money judgment against the debtor. Moreover, entry of judgment for the debt is proper because the court actually determined 'the existence and validity of the debt' in a core proceeding.

*Morrison v. W. Builders of Amarillo, Inc. (In re Morrison)*, 555 F.3d 473, 479 (5th Cir. 2009). The Fifth Circuit's logic in *Morrison* about pragmatism and judicial efficiency applies in this case. Therefore, the Court finds and concludes that Plaintiffs waived their right to liquidate their claims before a jury in the State Court Lawsuit by voluntarily prosecuting their claims against Mr. Tubbs in this adversary proceeding.

[11] Adv. ECF Nos. 56 and 57 by the Plaintiffs and Defendant respectively.

4

### III.     FINDINGS OF FACT

A.     **The Plaintiffs and the Defendant met at church**

Mr. and Ms. Robles initially met Mr. and Ms. Tubbs when they were all members of the same church. Mr. Robles, Mr. Tubbs, and Ms. Tubbs each served on the board of directors of the church. Mr. Robles and Ms. Tubbs also served as elders of the church. Mr. Tubbs served as a deacon, and he often volunteered his time providing various maintenance and repair tasks at the church building. Ms. Robles did not hold a leadership position at the church, but she did volunteer in the children's ministry, and she has led the prayer ministry. This summary of the leadership positions held in their church by the Plaintiffs and Defendant is relevant because Defendant contends, in part, that "the relationship between the parties was not arm's length as they all attended the same church where Plaintiffs had positions of authority within the Church community . . . [and] . . . Plaintiffs used their positions of authority to assert undue influence on Defendant to work below wage and to subsidize the financial burden of the project on his labor."[12] As more fully detailed *infra*, however, the Court finds and concludes that Defendant's contention lacks merit.

B.     **The Plaintiffs' home suffered substantial water damage**

In February 2021, Plaintiffs' home suffered substantial water damage caused by a burst water pipe that froze during an extended freeze event that affected much of North Texas. The Plaintiffs immediately contacted their homeowner's insurance company. The insurance company ultimately paid Plaintiffs approximately $173,000 for their insurance claim.[13]

---

[12] Adv. ECF No. 44 at pg. 4.
[13] Although Mr. Tubbs insinuated in his testimony that the Plaintiffs had mislead the insurance company, there was no credible evidence to suggest that the Plaintiffs misled or misrepresented anything to their insurance company.

Mr. Robles testified credibly that the insurance company advised him to immediately retain a water mitigation company, which he did. The water mitigation company immediately arrived and removed most of the first-floor flooring in the house along with the portions of the drywall and insulation that were damaged by water.[14]

After the water mitigation company completed the water mitigation and drying process, Mr. Robles began interviewing potential general contractors and sub-contractors for the renovation project. Additionally, Mr. Robles began obtaining bids directly from flooring companies and others that he anticipated would be necessary to renovate their home. Mr. Robles, however, was not satisfied or comfortable hiring any of the general and sub-contractors he had interviewed. About that same timeframe, however, Mr. Robles became aware that Mr. Tubbs might be someone he could trust and potentially retain as a general contractor for their home renovation project.

**C.    Mr. Tubbs agrees to serve as the general contractor for the Plaintiffs' home renovation project**

In the fall of 2021, Mr. Robles and others from their church volunteered to help Mr. and Ms. Tubbs move from Mr. Tubbs's parents' home where they had been living to another location. While at Mr. Tubbs's parents' property, Mr. Robles observed that, in addition to the house occupied by Mr. and Ms. Tubbs and his parents, a newer house and large barn were also on the property. Mr. Tubbs showed Mr. Robles the newer house and barn. According to the credible testimony of Mr. Robles, Mr. Tubbs then represented that he built the newer house and the barn "with his own hands" except for laying the foundation in the house and installing the insulation in the barn.

---

[14] Mr. Robles testified that the only room of the first floor of the home that did not suffer water damage to the floor was the master bedroom.

Mr. Robles testified further that he was "very impressed" with Mr. Tubbs's apparent skill and ability in constructing the newer house and barn on his parents' property. In their conversations, Mr. Tubbs also represented to Mr. Robles that he had worked for approximately ten years at a nationally-known and well-recognized home improvement store in the Pacific Northwest overseeing the installation of windows and doors for customers. Mr. Robles testified further that Mr. Tubbs also represented that he was a "licensed contractor" and that he had general contractor liability insurance coverage (but the evidence established that Mr. Tubbs was not a "licensed contractor", nor did he ever have general contractor liability insurance).

Based on Mr. Tubbs's representations that (i) he substantially built the newer house and barn located on his parents' property, (ii) he had extensive experience having worked in the door and window departments for a nationally known home improvement store, (iii) he had satisfactorily performed various "handyman" jobs at the church building, and (iv) he was a "licensed contractor" and had general contractor liability insurance,[15] Mr. Robles offered Mr. Tubbs the job to serve as the general contractor for the Plaintiffs' home renovation project.

Mr. Robles testified further that he told Mr. Tubbs that he "would not have to lift a hammer" unless he wanted to do some of the renovation work himself. He also gave Mr. Tubbs free reign as the general contractor to retain subcontractors he felt were necessary to perform the work on the home renovation project. Mr. Robles admitted, however, that although Mr. Tubbs had no prior experience serving as a general contractor for a home renovation project, he testified credibly that he wanted to give Mr. Tubbs the opportunity to gain experience as a general

---

[15] *See also* Pl. Ex. 8.

7

contractor to pave the way for Mr. Tubbs to launch his own general contractor and remodeling business—which Mr. Tubbs subsequently started using the d/b/a "Matt's Remodeling."

Mr. Tubbs testified that when Mr. Robles offered him the job to serve as the general contractor for the Plaintiffs' home renovation project, he initially did not want to accept the project. He felt he was not qualified and lacked the necessary experience to serve as a general contractor. He testified further that he felt manipulated and pressured by Plaintiffs to serve as their general contractor because of the positions in authority they held in the church.[16] Mr. Tubbs's testimony that the Plaintiffs asserted undue influence and duress to manipulate him to serve as their general contractor was not credible.

**D.    The project budget "Spreadsheet" and anticipated timeline to finish the Plaintiffs' home renovation project**

In late 2021, Mr. Tubbs formally agreed to serve as the general contractor for the Plaintiffs' home renovation project (which not only included renovating the damages that were covered by the Plaintiffs' insurance claim, but also additional renovation work requested by the Robles to upgrade their home). The parties, however, never drafted or signed a formal written contract for the project. Rather, Mr. Robles and Mr. Tubbs met at the Robles's home and together they prepared a Spreadsheet[17] itemizing the budget for labor and materials to complete the renovation project for each room.

---

[16] *See also* ECF No. 15 at ¶ 33; ECF No. 44 at pg. 4.

[17] *See generally* Pl. Ex. 1 (the "***Spreadsheet***"). Defendant sought to offer into evidence a slightly revised spreadsheet (Def. Ex. 0100-0109), but the Court sustained Plaintiffs' objection to the admissibility of the Defendant's exhibit. The Court notes, however, that the parties acknowledged that the Spreadsheet evolved over time as they agreed to modifications (usually reductions) of the work to be performed as detailed on the original Spreadsheet. Defendant's revised spreadsheet and the agreed upon modifications to the Spreadsheet are not materially different than the Plaintiffs' Spreadsheet that is in evidence (Pl. Ex. 1). Finally, even if the Defendant's excluded spreadsheet had been admitted into evidence, the excluded spreadsheet would not change the Court's ultimate Findings of Fact and Conclusions of Law.

To arrive at the various materials and labor costs for each task detailed on the Spreadsheet, Mr. Robles and Mr. Tubbs first walked through each room to determine the scope of work to be performed. Then, to arrive at the materials and labor cost budget for each specific line item in the Spreadsheet, they performed Google searches and considered prior quotes Mr. Robles had obtained from other third parties. Finally, the two arrived at what they thought would be a fair budget for labor and material costs to complete the renovation project.

On December 29, 2021, Mr. Tubbs provided the Plaintiffs with his initial timeline to complete the project by mid-February, 2022—which was eight or nine weeks.[18] On January 21, 2022, Mr. Tubbs revised his initial completion date to "the end of February [2022]."[19] As more fully detailed *infra*, however, Mr. Tubbs failed to begin, let alone complete, most of the renovation project tasks by the time he was ultimately dismissed by the Plaintiffs in or around August 2022.[20]

**E.    Plaintiffs advance $216,000 to Mr. Tubbs, but he failed to make any meaningful progress on the home renovation project by the time he was dismissed by Plaintiffs**

Mr. Tubbs admitted in his testimony that Plaintiffs advanced $216,000 to him for the home renovation project.[21] The overwhelming credible evidence established that (i) Mr. Tubbs failed to start, let alone complete, most of the items on the Spreadsheet; (ii) two of the projects Mr. Tubbs actually started—installing wood floors and kitchen cabinets—he failed to properly install the wood floors and never completed the kitchen cabinets which required Plaintiffs to hire other contractors to reinstall the wood floors and complete the kitchen cabinets; (iii) Mr. Tubbs failed to purchase most of the materials reflected on the Spreadsheet, even though funds for the purchase

---

[18] Pl. Ex. 10.
[19] Pl. Ex. 16.
[20] Pl. Ex. 17.
[21] ECF No. 51 at pg. 32, lines 19-23.

of such items was included in the $216,000 advanced to him by Plaintiffs; (iv) Mr. Tubbs failed to provide Plaintiffs with an accurate accounting of how he spent the entire $216,000 advanced to him by Plaintiffs; and (v) by late May and early June 2022, Plaintiffs made demand on Mr. Tubbs to return to them whatever funds he still had in his possession remaining from the $216,000 that Plaintiffs had advanced—the credible evidence established, however, that Mr. Tubbs paid himself whatever funds he still had in his possession and then on June 10, 2022, Mr. Tubbs informed Plaintiffs that "I do not have the money to finish the project right now."[22]

### F. Mr. Tubbs contends there is no binding contract between the parties, or in the alternative, he was excused from performing his obligations under the contract

Mr. Tubbs contends there was no binding contract between the parties, or in the alternative, he was excused from performing his obligations under the contract. The Court disagrees and will address each of Mr. Tubbs defenses, in turn.

#### 1. *Mr. Tubbs contends Tex. Prop. Code § 162.031(b) provides an affirmative defense to Plaintiffs' claims*

Mr. Tubbs contends that Tex. Prop. Code § 162.031(b) constitutes an affirmative defense to Plaintiffs' claims.[23] Section 162.031 of the Texas Property Code addresses the misapplication of trust funds by the "trustee" holding such funds. In support of his contention, Mr. Tubbs argues that "all moneys tendered by Plaintiffs to Defendant were used by the Defendant for project expenses and the Defendant's general administrative and overhead expenses."[24] Mr. Tubbs contends further that "[o]f the $216,000 approximately $138,000 was expended on third party materials and labor."[25] Although there is disagreement between the Plaintiffs and Mr. Tubbs

---

[22] Pl. Ex. 2.
[23] Adv. ECF No. 15 at ¶ 27; Adv. ECF No. 58 at pg. 5.
[24] *Id.*
[25] Adv. ECF No. 51 at pg. 63, lines 13-15; *See also* Adv. ECF No. 58 at pg. 5. *See also* Pl. Ex. 13 at ROG No. 13.

concerning the funds Mr. Tubbs actually spent on labor and materials, the overwhelming credible evidence established that, but for the completion of a couple archways,[26] Mr. Tubbs never started many of the projects detailed in the Spreadsheet. Furthermore, of those few projects that he did start, only two archways were properly completed.

Mr. Tubbs next contends that "[t]he difference of $78,000 [between the $216,000 advanced and the $138,000 allegedly expended on third-party materials and labor] represents compensation taken by Tubbs for overhead, self-performed labor, and general contractor's fee."[27] The Court disagrees. The Spreadsheet did not include a line item specifically designated as "general contractor fee" or "overhead fee" for Mr. Tubbs's compensation as general contractor. Mr. Robles testified credibly that he assumed Mr. Tubbs had marked up each of the line-item dollar figures reflected in the Spreadsheet budget to include a component for his general contractor fee. In support of his testimony, Mr. Robles highlighted the bid he had previously obtained for the flooring material and labor installation costs to replace the damaged floors—$31,334.05.[28] Yet, the total flooring material and labor costs Mr. Tubbs included in the Spreadsheet budget was approximately $42,000—representing an increase of approximately 35%—of which, Mr. Robles believed was the mark-up reflecting Mr. Tubbs's general contractor and overhead fees. Finally, Mr. Robles testified credibly that he anticipated Mr. Tubbs would earn approximately $40,000 as the general contractor to complete the Plaintiffs' home renovation project.

Mr. Tubbs, on the other hand, testified that his understanding was that he was to be paid a flat monthly general contractor fee of $10,000 per month for the duration of the project. He

---

[26] Adv. ECF No. 51 at pg. 63, line 23 through pg. 64, line 13.
[27] Adv. ECF No. 51 at pg. 63, lines 21-25 and pg. 65, lines 19-22.
[28] Pl. Ex. 12.

testified further that he required a $10,000 monthly fee to justify quitting his current job to work "full time" as the general contractor for the Plaintiffs' home renovation project. Mr. Tubbs, however, could not point to any other evidence to corroborate his testimony. Rather, the credible evidence belies Mr. Tubbs's testimony. For example, the flooring components in the Spreadsheet budget noted above contradict Mr. Tubbs's testimony. Additionally, on December 29, 2021, Mr. Tubbs provided Plaintiffs with a written estimated timetable to start and complete the project in eight or nine weeks [29] —which would have resulted in a total general contractor fee of approximately $20,000 to $22,500 as opposed to the $78,000 that he admittedly paid himself.

The Court found Mr. Robles's testimony was compelling and credibly controverted Mr. Tubbs's contention that he was entitled to $78,000 as a general contractor/overhead fee. The Court further found Mr. Tubbs's testimony regarding his understanding that he was to be paid a flat general contractor fee of $10,000 per month for several months was not persuasive, not credible, and contradicted by the credible evidence in the record.[30]

Based on the clear, compelling, and credible evidence, the Court finds and concludes that Tex. Prop. Code § 162.031(b) does not provide Mr. Tubbs a viable affirmative defense to the claims asserted by Plaintiffs.

---

[29] Pl. Exs. 10, 16.
[30] *See* Mr. Robles' testimony at ECF No. 51 at pg. 14, line 16 though pg. 15, line 4 ("just from a general contractor perspective . . . I thought at a minimum he would probably make around $40,000 from this project"). Mr. Tubbs testified that he believed he was entitled to "$10,000 a month" as a general contractor fee. *See* Adv ECF No. 51 at pg. 36, line 18. Therefore, even though Mr. Tubbs originally estimated the project would take "eight or nine weeks" (*see* Pl. Exs. 10, 16), providing an allowance for reasonable unanticipated delays in the project could result in the project lasting sixteen weeks—double Mr. Tubbs original estimate—resulting in a maximum reasonable general contractor fee of $40,000 for Mr. Tubbs.

### 2. Mr. Tubbs contends "illegality," "unclean hands," "fraud," and "equitable estoppel" as defenses to Plaintiffs' claims

Mr. Tubbs contends that Plaintiffs' claims against him should fail because "Plaintiffs used Defendant to commit insurance fraud."[31] The Court disagrees. There was not one shred of evidence in the record to suggest Plaintiffs committed insurance fraud. To the contrary, the credible evidence established that the Plaintiffs were fully transparent with their insurance company, and they paid out of their own pocket (as opposed to insurance proceeds) for items that were intended to upgrade their home separate and apart from the damages that were subject to their insurance claim.

Based on the clear, compelling, and credible evidence, the Court finds and concludes that there was not one shred of evidence to support Mr. Tubbs's allegations of "illegality" and "unclean hands."

### 3. Mr. Tubbs contends "lack of privity of contract," "repudiation," "unilateral mistake/mutual mistake," "material change to alleged contract terms," and "statute of frauds" as defenses to Plaintiffs' claims

Mr. Tubbs contends that Plaintiffs' claims against him should fail because of several theories that excuse performance under a contract.[32] The Court disagrees. Although it is not disputed that the parties did not draft or execute a written contract that one would typically see for this type of home renovation project, the uncontroverted testimony of the Plaintiffs and Mr. Tubbs established that there was a binding contract between Plaintiffs and Mr. Tubbs as evidenced by their many text and email communications and the Spreadsheet prepared by both Mr. Robles and Mr. Tubbs.[33] There is no credible evidence in the record to support Mr. Tubbs's theories of "lack

---

[31] Adv. ECF No. 15 at ¶¶ 28, 29, 32, and 37.
[32] Adv. ECF No. 15 at ¶¶ 30, 31, 34, 35, and 36; *see also* ECF No. 44 at pg. 4; see also ECF No. 58 at pg. 5.
[33] *See* Pl. Ex. 1.

of privity of contract," "repudiation," "unilateral mistake/mutual mistake," "material change to alleged contract terms," or "statute of frauds" asserted by Mr. Tubbs.

Based on the clear, compelling, and credible evidence, the Court finds and concludes that there was a valid contract between Plaintiffs and Mr. Tubbs. Additionally, there is no credible evidence in the record to excuse Mr. Tubbs from performing his contractual obligations based the theories asserted by Mr. Tubbs.

### G.    Plaintiffs' Damages against Mr. Tubbs

Plaintiffs contend that they have suffered damages resulting from Mr. Tubbs's breach of contract, false pretense, false representations, and willful and malicious actions. Based on the credible evidence in the record, the Court finds and concludes that Plaintiffs suffered damages in the total liquidated amount of ***$152,610.05***; calculated as follows:

- Total funds advanced to Mr. Tubbs:  $216,000.00[34]

- <Less: payments identified by Mr. Tubbs for alleged labor, materials, and other costs related to the project:>  <$138,000.00>[35]

    Subtotal (funds unaccounted for by Mr. Tubbs):  $ 78,000.00[36]

- Add: additional labor and materials expenses incurred by Plaintiffs for having to pay third-party contractors to re-do how Mr. Tubbs's defective work on (i) the flooring in the amount of $31,334.05,[37] and (ii) the cabinets in the

---

[34] *See* Adv. ECF No. 51 at pg. 32, lines 19-23.

[35] *See* Adv. ECF No. 63 at lines 13-19 (Mr. Tubbs's testimony). Plaintiffs, on the other hand, contend that several of the items included in the $138,000 asserted by Mr. Tubbs were not used by Mr. Tubbs on the Plaintiffs' home renovation project, but rather, were misappropriated by Mr. Tubbs for his own personal benefit and use. Such misappropriated funds that were established by Plaintiffs are added back in liquidated damages calculation.

[36] As detailed *supra* in § III(F)(1), Mr. Tubbs contends he paid himself the remaining $78,000 as his general contractor fee, *see* Adv. ECF No. 51 at pgs. 63 lines 21-25; 65 lines 19-22. The Court disagrees. The Court finds that Mr. Tubbs's general contractor fee of approximately $40,000 is included in the $138,000 of funds used by Mr. Tubbs for labor, materials, and other costs. The Court further finds and concludes that Mr. Tubbs willfully and maliciously misappropriated the $78,000 for his own personal use.

[37] *See* Pl. Ex. 12.

|  |  |
|---|---|
| amount of $29,695.00:[38] | $ 61,029.05 |
| • Add: Mr. Tubbs's misappropriation of funds to purchase a personal floor sander paid with Plaintiffs' funds: | $ 5,000.00[39] |
| • Add: Mr. Tubbs's misappropriation of funds to pay his personal credit card bills: | $ 8,581.00[40] |
| **Total liquidated damages** | **$ 152,610.05** |

## IV.  CONCLUSIONS OF LAW

As detailed above, Plaintiffs suffered damages in the total liquidated amount of $152,610.05 resulting from Mr. Tubbs's breach of contract, false pretense, false representations, and willful and malicious actions. The Court must now determine whether any of the liquidated damage claims are nondischargeable under §§ 523(a)(2)(A) or 523(a)(6).

**A.  Count I: 11 U.S.C. § 523(a)(2)(A)—False Pretense, False Representation, or Actual Fraud**

A debt may be declared nondischargeable under § 523(a)(2)(A) if it is a debt "for money . . . to the extent obtained by—(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . . ."[41] The Fifth Circuit distinguishes false pretenses and false representations from "actual fraud" for purposes of § 523(a)(2)(A).

False representations and false pretenses require the Plaintiffs to prove (a) the existence of a "knowing and fraudulent falsehood," (b) "describing past or current facts," and (c) that was justifiably relied upon by the Plaintiff.[42] After fully considering and examining the admissible

---

[38] See Pl. Ex. 11.
[39] *See* uncontroverted credible testimony of Mr. Robles at 11:08:02 am on 7/28/2025.
[40] *See* uncontroverted credible testimony of Mr. Robles at 11:08:02 am on 7/28/2025.
[41] 11 U.S.C. § 523(a)(2)(A).
[42] *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995).

evidence, the Court finds and concludes that Plaintiffs have established by a preponderance of the evidence that Mr. Tubbs made the following knowing and fraudulent falsehoods describing past or current facts that were justifiably relied upon by Plaintiffs:

- the representation by Mr. Tubbs that he built the newer house and barn located on his parents' property—the Court finds and concludes that such representations were more than "puffing" as argued by Mr. Tubbs;

- the representation by Mr. Tubbs that he was a licensed contractor—he was not; and

- the representation by Mr. Tubbs that he had general contractor liability insurance coverage—he did not have any such any insurance.

Because the Court finds and concludes that Mr. Tubbs made the above false pretenses and false representations to Plaintiffs, and Plaintiffs justifiably relied upon such false pretenses and false representations, the Court finds and concludes that the Plaintiffs have satisfied their burden to establish by a preponderance of the evidence the elements necessary under § 523(a)(2)(A) for a determination that the damages they incurred in the liquidated amount of $152,610.05 be deemed nondischargeable. Because the Court finds and concludes that Mr. Tubbs made false pretenses and false representations to Plaintiffs, the Court need not determine if Mr. Tubbs committed actual fraud under § 523(a)(2)(A).

Therefore, **Count I** of the Complaint is ***GRANTED***.

**B.    Count II: 11 U.S.C. § 523(a)(6)—Willful and Malicious Injury**

A debt may be declared nondischargeable under § 523(a)(6) "for willful and malicious injury by the debtor to another entity or to the property of another entity . . . ."[43] Section 523(a)(6) requires "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to

---

[43] 11 U.S.C. § 523(a)(6).

injury."[44] In the Fifth Circuit, "an injury is 'willful and malicious' where there is either: (1) an objective substantial certainty of harm arising from a deliberate or intentional action or (2) a subjective motive to cause harm by a party taking a deliberate or intentional action."[45] In addition, "the debtor must have intended the actual injury that resulted."[46]

Whether a contractual debt may be discharged under § 523(a)(6) "depends upon the knowledge and intent of the debtor at the time of the breach, rather than whether conduct is classified as a tort or falls within another statutory exception to discharge."[47] Courts "may infer that a debtor acted with malice, for purposes of § 523(a)(6), if the debtor acts in a manner which one knows will place the [plaintiff] at risk . . . ."[48]

After fully considering and examining the admissible evidence, the Court finds and concludes that Plaintiffs have satisfied their burden to establish, by a preponderance of the evidence, that Mr. Tubbs acted willfully and malicious when he misappropriated for his own personal benefit at least $152,610.05 of the funds advanced to him for the Plaintiffs' home renovation project. Consequently, the Court finds and concludes that the Plaintiffs have satisfied their burden to establish by a preponderance of the evidence the elements necessary under § 523(a)(6) for a determination that the damages they incurred in the liquidated amount of $152,610.05 be deemed nondischargeable.

Therefore, **Count II** of the Complaint is ***GRANTED***.

---

[44] *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998) (emphasis omitted).
[45] *Ward Family Found. v. Arnette (In re Arnette)*, 454 B.R. 663, 700 (Bankr. N.D. Tex. 2011) (citing *Matter of Miller*, 156 F.3d 598, 604–06).
[46] *State of Tex. By & Through Bd. of Regents of Univ. of Texas Sys. v. Walker*, 142 F.3d 813, 823 (5th Cir. 1998) (quoting *Corley v. Delaney (In re Delaney)*, 97 F.3d 800, 802 (5th Cir. 1996)).
[47] *Williams v. Int'l Brotherhood of Elec. Workers Local 520 (In re Williams)*, 337 F.3d 504, 510 (5th Cir. 2003).
[48] *SE Prop. Holdings, L.L.C. v. Green (In re Green)*, 968 F.3d 516, 524–25 (5th Cir. 2020) (quoting *Brooke Credit Corp. v. Lobell (In re Lobell)*, 390 B.R. 206, 217 (Bankr. M.D. La. 2008)).

### C.  Mr. Tubbs's alleged defenses and affirmative defenses

For the reasons detailed *supra* in § III(F), the Court finds and concludes that each and every defense and affirmative defense asserted by Mr. Tubbs lacks merit and are hereby **OVERRULED** and **DENIED**.

## V.  CONCLUSION

For the foregoing reasons, the Court finds and concludes that the Plaintiffs satisfied their burden to establish that the Plaintiffs' claims in the liquidated amount of $152,610.05 against Mr. Tubbs should be declared nondischargeable under §§ 523(a)(2)(A) and 523(a)(6). Therefore, each of the claims and causes of action contained in Counts I and II of the Complaint are **GRANTED** as set forth herein.

The Court will enter a separate final judgment consistent with these Findings of Fact and Conclusions of Law.

**### END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW ###**